THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JOHN HORTON | ) | |
| | ) | |
|     Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF ROCKFORD, ARDUINO (Star | ) | |
| #235), J. BARTON, ESTATE OF | ) | |
| HOWARD FORRESTER,  GAMBINI, D. | ) | **COMPLAINT** |
| GRAY, GREG HANSON (Star #234), | ) | |
| DOMINIC IASPARRO , S. JOHNSON, | ) | |
| KELLETT (#188), ESTATE OF | ) | |
| GREGORY LINDMARK, C. | ) | |
| MCDONALD, R. NELSON, OLSEN, | ) | |
| PICCIRILLI, STEVE  PIRAGES, | ) | |
| POBJECKY (#48), JOHN POZZI (Star | ) | |
| #34), ROBERT REDMOND, MARK | ) | |
| SCHMIDT, BRUCE SCOTT (Star #142), | ) | |
| DAN SCOTT (Star #164), P. TRIOLO, | ) | |
| AND UNKNOWN EMPLOYEES OF THE | ) | **JURY DEMAND** |
| CITY OF ROCKFORD | ) | |
| | | |
|     Defendants. | | |

Now comes Plaintiff, John Horton, by his attorneys, Loevy & Loevy, and

complaining of Defendants City of Rockford, Arduino, Barton, Forrester, Gambini,

Gray, Hanson, Iasparro, Johnson, Kellett, Lindmark, McDonald, Nelson, Olsen,

Piccirilli, Pirages, Pobjecky, Pozzi, Redmond, Schmidt, B. Scott, D. Scott, Triolo, and

Unknown Employees of the City of Rockford, states as follows:

### Introduction

1.    Plaintiff John Horton spent the majority of his life—over 23 years—

incarcerated for crime he did not commit.

2.     Mr. Horton ("John" or Plaintiff) was convicted in March 1995 of an armed robbery-murder that occurred at the McDonald's on Charles Street in September 1993 ("Charles Street McDonald's shooting"). He was convicted after the Defendants manipulated witnesses, fabricated evidence, and withheld evidence that would have demonstrated John's innocence.

3.     Included among that fabricated evidence was an involuntary false confession attributed to Plaintiff, which was concocted and coerced by Defendants after hours of illegal interrogation. During this interrogation, Defendants used threats, intimidation, and manipulation to obtain a false and involuntary confession from Plaintiff.

4.     To corroborate Plaintiff's false, involuntary confession, Defendants also fabricated evidence, including false statements from a vulnerable 15-year old boy that he saw Plaintiff with the gun days after the Charles Street McDonald's shooting and that Plaintiff confessed to him that he committed the crime – both were later proven to be false.

5.     In truth, on the night that Defendants were interrogating Plaintiff and fabricating evidence against him, they had the real perpetrator in custody. Rather than conducting a thorough and meaningful investigation that would have revealed the truth, the Defendants let the perpetrator go and created their own version of events to wrongfully detain and convict Plaintiff.

6. As a result of the Defendants' misconduct, Plaintiff was wrongfully convicted of armed robbery and homicide and sentenced to life in prison without parole.

7. In October 2016, Plaintiff's conviction was vacated. After an extensive eight-month review, the Special Prosecutor dismissed all charges against him, and John was finally exonerated.

8. Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of Defendants' misconduct.

## Jurisdiction and Venue

9. This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

10. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events giving rise to this complaint occurred in this judicial district.

## Parties

12. Plaintiff John Horton is a 42-year-old resident of Rockford, Illinois. At the time of his arrest in September 1993, he was 17 years old. He currently lives

with his wife, Melissa, and works at the Chrysler Assembly Plant in Belvidere, Illinois.

13. At all times relevant hereto, Defendants Arduino, Barton, Forrester, Gambini, Gray, Hanson, Iasparro, Johnson, Kellett, Lindmark, McDonald, Nelson, Olsen, Piccirilli, Pirages, Pobjecky, Pozzi, Redmond, Schmidt, B. Scott, D. Scott, Triolo, and Unknown Employees of the City of Rockford (hereinafter "Defendant Officers") were police officers in the Rockford Police Department ("RPD"). All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation of the murder at issue.

14. Defendant City of Rockford is an Illinois municipal corporation, The City of Rockford is or was the employer of each of the Defendant Officers.

## Evening of September 19, 1993

15. On September 19, 1993, seventeen-year old John Horton spent a quiet Sunday evening with his brother and sister, and on the phone with his then-girlfriend, Melissa Pappas.

16. It was an ordinary and somewhat monotonous Sunday evening for John. In the late afternoon/early evening, Melissa went to see John. Later in the evening, around 8 p.m. or 9 p.m., Melissa went home and John lounged around his sister's house.

17. At approximately 9:30 p.m., Melissa contacted John and they spoke on the phone for a while. Half hour later, John's older brother, Larry Horton came home and drove him to see his friend, Garlyn Wilks.

18.     Back then, John and Garlyn were very close friends. They borrowed and wore each other's clothes all the time. It was not unusual for them to stop by each other's house to exchange clothes.  On September 19, 1993 around 10 p.m., John went to Garlyn's house to pick out some clothes for school the next day. John and his brother were there for approximately 10-20 minutes and then they went home for the night.

19.     Meanwhile, in a different part of town, acting on his own, a masked gunman entered in a McDonald's restaurant on Charles Street. Immediately upon entry, he shot Arthur Castaneda, a customer of the restaurant, in the face and yelled for everyone to go the back of the restaurant.

20.     The gunman demanded the restaurant manager, Mary Casey, to open the floor safe in the back office. He shoved her to the ground, and while pointing the gun at her, threatened her with words to the effect of "You got 20 seconds to open it, bitch, or I'm going to pop you."

21.     Ms. Casey complied and opened the safe. She handed him two brown bags of money, containing approximately $500. She started to take the cash out of the tills. The gunman said he didn't want it, and instead, took the bags of money and ran out of the McDonald's.

22.     The customers and employees of the restaurant called for help and tried to save Mr. Castaneda. Sadly, the gunshot was fatal and Mr. Castaneda was pronounced dead shortly after arriving at Swedish American Hospital.

## Search of the Crime Scene and Eyewitness Interviews

23.     The Rockford police arrived shortly after the call and interviewed several witnesses that night and into the early morning.

24.     During these initial interviews, the police learned that someone had attempted to rob the restaurant less than 24 hours earlier. On the same day at around 1:20 a.m., Patrick Kenney, the swing manager, went to unlock the doors on the west side of the restaurant (the same doors that witnesses stated the gunman entered through) when he noticed a masked man wearing a dark sweatshirt and pants holding a black semi-automatic gun emerging from the bushes. Mr. Kenney quickly re-locked the door, warned the other employees, and the masked man left the scene.

25.     In fact, the attempted robbery was the reason why Ms. Casey was at the restaurant the evening of September 19th. She explained during the police interview that it was her day off but because of what had transpired the night before, she went to the restaurant to give support to the employees.

26.     Ms. Casey told the officers that the gunman appeared very calm and in control. She did not notice any panic in his voice at any point.

27.     Mr. Kenney explained in his statement that he believed the man who shot Mr. Castaneda and robbed the McDonald's was the same person who robbed the restaurant the year prior -- on August 7, 1992.

28.     Mr. Kenney explained that the voices were similar, if not identical: In both incidents, the robber told everyone to go to the back, gave the manager 20 to 30

seconds to open the safe, and threatened to "pop" the manager if she did not follow his orders.

29.     Rockford Police Officers Cole, Clay, Cone, Combs, Stovall, Bruno, T. Peterson, J. Gulley, Honzel, Perry. Sanger, and Scroggins were called to search the scene.

30.     On foot, the officers searched the area contained within Charles Street (north), 24th Street (east), 10th Avenue (south), and 22nd Street (west). They also searched the area by East High School. Nothing of value was found.

31.     By squad, RPD searched wider area with perimeters at Charles Street, 25th Street, Broadway Avenue and 20th Street. A pair of pants was recovered but later discovered to be unrelated to the homicide.

32.     Witnesses at or around the restaurant identified the gunman as a black man with medium to dark complexion, medium to heavy build, and estimated around 6" tall. Witnesses indicated that the gunman was wearing dark clothing with hood and bandana covering most of his face.

33.     Witnesses described the gun as a dark handgun with a long handle.

### Interrogation of John Horton

34.     Over the course of the next few days, the RPD received calls from people in the community who believed they had information about the gunman. The RPD investigated and pursued these leads.

35.     Many of these tips were inaccurate, unrelated to, or not useful to the investigation.

36.    One anonymous source told the police that John admitted to being the gunman.

37.    By September 24th, John had heard that police officers were asking about him. On his own accord, before any officers attempted to reach him directly, John went to the Winnebago County Public Safety Building to clarify the situation.

38.    At the time, John was in the 11th grade, stood 5'11" and weighed around 175-185 lbs. The sum of his criminal history was three traffic tickets.

39.    Despite having knowledge of John's minor age, Defendant Officers detained and interrogated him on and off through the evening and into the early morning for approximately ten hours, outside the presence of a parent, guardian, attorney, or other adult interested in his welfare.

40.    John was told to wait for the detectives and was eventually placed in an interview room. The room was small with a desk and three chairs. The room was very cold and lights were bright.

41.    At some point, Defendants Bruce Scott and Howard Forrester entered the room and began questioning John. At first, the tone Defendant Scott and Forrester used with John was benign. John gave them information about his activities and whereabouts on September 19th and 20th.

42.    John explained that he was at his sister's house for most of the night on September 19th. Around 10 p.m., Larry took him to Garlyn's house to get some clothes for school the next day.

43.     Defendant Officers used the information that John provided to them as the baseline of their fabricated version of events.

44.     Over the course of the next several hours, Defendant Officers used various tactics, such as threatening, manipulating and isolating John, as well as denying him proper nutrition and sleep to coerce John into adopting their made-up story.

45.     John repeatedly asserted his innocence and denied involvement in the homicide and robbery. He told the Defendant Officers that he did not shoot anyone or rob the McDonald's. He explained that he owned a TEC 22 handgun, but that his cousin, Clifton "Buddy" English had it.

46.     The Defendant Officers refused to accept John's protestations of innocence and kept responding back with words to the effect of "Yes, you did do it" and "We know you did it; just tell us you did it". Each time John claimed his innocence, the Defendant Officers became more aggressive and manipulative.

47.     At one point, Defendant Forrester vowed that even if someone came in and claimed responsibility for the crime, John would not be leaving the building.

48.     Another time, Defendant Redmond told John that if he did not admit to the crime and agree with their version of events he would spend the rest of his life in prison.

49.     The Defendant Officers also threatened John with physical abuse. Defendant Forrester repeatedly told John that he would "kick his black butt" or words to that effect. On at least one occasion, Defendant Forrester told John that he

would see that John "fry in the electric chair" or words to that effect. Defendant Scott and other Defendant Officers observed Defendant Forrester's threats, and either participated or stood idle and did nothing to prevent it.

50.     These verbal threats were compounded with physical intimidation. At one point, Defendant Forrester was alone in the interrogation room John. Defendant Forrester towered over John, millimeters from his face, and while angrily pointing his finger at John, threatened John to say he committed the crime.

51.     Another time, the Defendant Officers maneuvered their chairs so to back John into a small corner of the interrogation room.

52.     Perhaps the most daunting example of these threats of physical harm was when Defendant Forrester was toying with his gun and said to John, "What if I took this gun out and shoot you? How would you feel?" or words to that effect.

53.     John was scared: He believed that that the Defendant Officers would make good on these threats.

54.     Another tactic the Defendant Officers employed to overbear John's will was by making him believe that his family turned on him. John had explained to the Defendant Officers about the rumors that he claimed responsibility for the crime: He was trying to boaster his reputation. He told them that it was his cousin, Buddy English, who actually committed the crime and that Larry was also present when Buddy admitted to the homicide.

55.     Defendant Officers used this information to further manipulate and intimidate him. The Defendant Officers kept the solid door to the interrogation

room shut throughout the entire 10+ hour of questioning except for one time: After John told Defendant Officers that Buddy was responsible for the Charles Street McDonald's shooting, they put Buddy in the room near John and opened the doors just long enough for John to hear Buddy claim that he did not do it. In effect, the Defendant Officers communicated to John that Buddy knew that John reported him to the police and that Buddy, who had a criminal history, was mad. In other words, that John was no longer safe in the neighborhood.

56.     Defendants Scott and Forrester also falsely told John that Larry was not telling the same story, when in fact, Larry had also told Defendant Scott approximately half hour earlier that Buddy committed the murder.

57.     After telling John that his brother did not support his story and that Buddy was denying responsibility, Defendant Officers told John that they had the murder weapon and he was in big trouble.

58.     The Defendant Officers' lies made John feel confused and nervous. These lies were intended to and did create a sense of hopelessness and despair in John. Coupled these feelings with the fear he felt from the Defendant Officers' threats, John started to break apart.

59.     John was also suffering from exhaustion, his head was spinning and his body was aching from sitting in the same spot for hours upon hours. A couple times throughout the evening he put his head down and tried to sleep when the Defendant Officers were not in the room.

60.     On one of these occasions, Defendant Forrester stomped in the interrogation room, pounded on the table, and yelled words to the effect of "This is no place for your black ass to sleep."

61.     Once the Defendant Officers sensed John's impaired state of mind, they sent a new detective to talk to John. Defendant Redmond played the "reasonable cop" and presented John with a less reprehensible explanation for the shooting than cold-hearted murder—that the shooting was an accident.

62.     Defendant Redmond told John that if he admitted to the crime and said it happened in a certain way that Redmond would make sure that John was not charged with the most severe crimes.

63.     Shortly after planting the seed to the Defendant Officers' fabricated version of events, Defendant Forrester stormed into the interrogation room, dropped a brown money bag that looked like the ones stolen at the McDonald's on the table, said, "What is this?", and stormed out. John had no idea and asked Defendants Redmond and Scott about the significance of the bag.

64.     After hours of interrogation by the Defendant Officers, John succumbed to the Defendants' manipulation and coercion and falsely implicated himself in the homicide and robbery.

65.     John was so defeated that he simply told the Defendant Officers to write whatever they wanted.

## Fabrication of Evidence

66.     That evening, Defendants Scott and Redmond typed a false statement leading John to implicate himself for crimes he did not commit.

67.     The Defendant Officers knew that John's statement was coerced, false, and merely a recitation of their fabrications. Nevertheless, the Defendants used John's coerced, fabricated confession to obtain his arrest, detention, prosecution, and conviction, all without probable cause.

68.     In efforts to dispel the notion that the statement was fabricated and that John did not read the statement before signing, Defendants Scott and Redmond deliberately made some typographical errors for John to correct. John knew that the statement was false and simply signed the document without reviewing it. Frustrated, Defendant Officers pointed the mistakes out to John and had him initial next to those mistakes.

69.     At one point, Defendants Scott and Redmond gave John a diagram of the McDonald's. They gave him specific instructions, telling him exactly where to place each line and symbol. According to Defendant Scott's investigation report, these markings represent various things (e.g., where people were located).

70.     John was not at the McDonald's when the shooting occurred; he did not know where various people were located, the direction people went to the back, or which doors the gunman entered and exit.

71.     The diagram was entirely concocted by Defendants Scott and Redmond.

72.     Defendant Officers also made false statements in their reports. In order to explain John's purported "confession", Defendant Officers recitation of the interrogation contained fabrications. For example, Defendant Scott's report states that they knew John was lying because John supposedly told them that he owned a Tech 25 gun and the Defendant Officers had never heard of it and Defendant Olson was told by a gun shop that Tech 25 did not look like a Tech 22. Further, the report states that John confessed almost "imediatley" (sic) after Defendant Forrester produced the brown money bag. This statement is not true; John did not know what that bag was and in fact, asked about it. John did not succumb to the Defendants and falsely implicate himself until sometime after the money bag incident.

73.     The Defendant Officers knew that prosecutors relied their police reports for grand jury proceedings, criminal prosecutions, and expected the statements contained in these reports to be truthful and accurate. Despite this, Defendant Officers lied in their reports, causing John's false arrest, and wrongful prosecution, conviction, and incarceration.

74.     To further shore up their false charges against John, Defendant Officers coerced Lynn Hollingshed – a fifteen year old boy – to make incriminating statements about John.

75.     John and Lynn knew each other through the Hobson brothers. John and Carl Hobson were friends and Lynn was friends with Carl's brother, Mike. On occasion, John would see Lynn at the Hobson residence.

76.     As a fifteen year old boy with a juvenile record, Lynn was a vulnerable witness.

77.     The Defendant Officers were interrogating Lynn the same night they interrogated John. Defendant Pozzi brought Lynn to the detectives' unit that night.

78.     At the time of the McDonald's shooting investigation, Lynn was potentially facing charges for a shooting incident a month prior. The Defendant Officers were familiar with this prior incident. In fact, Defendant Pozzi investigated that prior shooting and knew about Lynn's involvement in that incident.

79.     One or more of the Defendant Officers coerced Lynn to sign a statement indicating that (1) about a week before the McDonald's shooting, in front of Lynn and approximately six other people, John said that he needed a quicker way to make money and was going to rob McDonald's one day, (2) four hours after the McDonald's shooting John called his friend, Carl Hobson and when Lynn picked up, John asked Lynn to help sell his gun, (3) later in the day on September 20, John told Lynn that he was responsible for the McDonald's shooting the night before, and (4) on September 21, John showed Lynn and about three other people a Tec-22..

80.     These statements are false and have been disproven.

81.     Defendant Officers concealed from Plaintiff, his criminal defense attorneys, and prosecutors that they had coerced a false confession, fabricated evidence, manufactured witness testimony against Plaintiff, and withheld exculpatory evidence.

82. As a result of Defendant Officers misconduct, Plaintiff was arrested, detained, prosecuted, and convicted for a purported crime that they knew he did not commit.

## Plaintiff's Trial and Conviction

83. In March 1995, Plaintiff was tried for the Charles Street McDonald's shooting.

84. Plaintiff's confession was introduced against him at trial. Lynn Hollingshed testified for the prosecution consistent with his prior statement to the police. No fingerprints, DNA, or other forensic evidence linked John to the crime. None of the eyewitnesses who testified at the trial identified John as the gunman.

85. None of the Defendants who testified against John at his trial, his motion to suppress hearing, or during the grand jury proceeding, including Defendants Iasparro, Redmond, and Scott, disclosed how they obtained the false and involuntary inculpatory statement from John. Nor did any of the Defendants disclose how they had coerced Lynn Hollingshed into making false incriminating statements against John.

86. As a result of the above-described misconduct on the part of the Defendants, on March 22, 1995, after ten hours of deliberation, a jury convicted John of armed robbery and murder and John was sentenced to life imprisonment without parole.

## Clifton "Buddy" English's Confession

87. On August 4, 1995, Clifton "Buddy" English contacted John's attorneys and confessed that he committed the armed robbery and murder that John was convicted for.

88. His confession was memorialized in multiple written statements, which were either signed or notarized under oath.

89. The Defendants should not have been shocked or surprised that Buddy English was the actual perpetrator: During the investigation, several individuals told the Defendant Officers that Buddy was the one responsible for the crime. For example, Larry told Defendant Scott on September 24, 1993 that Buddy committed the Charles Street McDonald's shooting. He explained that Buddy gave him the gun and he hid it at his sister's house. The Defendants Officers recovered the gun exactly where Larry told them it would be.

90. On the same night they interrogated John, the Defendant Officers also interviewed Buddy. That night, Buddy denied involvement and provided Defendant Officers with a false alibi. Defendant Officers checked his alibi and from their investigation, knew that Buddy was lying. Despite this, Defendant Officers released him that evening and fabricated evidence against John instead. As Defendant Forrester promised John that night, "Even if Clifton came in and admitted to this crime, you still wouldn't be leaving here" or words to that effect.

91. Buddy spent 18 years trying to get someone to listen to him and exonerate John. For example, in February 2006, he wrote and sent a letter to then

Winnebago County State's Attorney Paul Logli to confess to the crime. At another point in 2008, he confessed to Dr. James A. Tiller during a mental health screening at Hill Correctional Center. He also spoke to individuals with Hill Correctional Center Internal Affairs and confessed to the crime. In November 2008, he sent John's then-attorney a signed affidavit confessing to the murder. The written affidavit contained specific details for the crime that was not known to the public.

## Plaintiff's Exoneration

92. Throughout his prosecution and before and after his incarceration, John continued to maintain his innocence and pursued all possible legal avenues to prove it. Without the benefit of counsel, John filed three post-conviction petitions; all were dismissed.

93. In 2013, John asked for leave to file a successive post-conviction petition. The court denied his request on October 21, 2014.

94. John appealed the court's decision and on October 12, 2016, the Illinois Appellate Court reversed John's conviction and remanded the case for a new trial.

95. After conducting an extensive eight month review of the case, on October 4, 2017, an appointed Special Prosecutor dropped all charges against the Plaintiff because he did "not have a reasonable belief this charge can be sustained beyond a reasonable doubt."

## Rockford Police Department's Pattern and Practice of Misconduct to Secure Wrongful Prosecutions and Convictions

96. The constitutional injuries that Plaintiff suffered were caused by the policies and practices of the Rockford Police Department.

97.     Before, during and since the unlawful investigation, prosecution, and conviction of Plaintiff, the City of Rockford, and the RPD, by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques by RPD investigators, including but not limited to: fabricating evidence; coercing witnesses; failing to promptly document and disclose material, exculpatory and impeachment evidence; failing to investigate known exculpatory evidence or otherwise; failing to conduct constitutionally adequate investigations; disregarding the Fifth and Fourteenth Amendment rights of criminal suspects and defendants; and engaging in the ongoing affirmative concealment and cover-up of police misconduct.

98.     Before, during and since the unlawful investigation, prosecution, and conviction of Plaintiff, the City of Rockford, and the RPD, by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of failing to adequately train, supervise, and discipline RPD investigators regarding fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to: conducting interrogations and witness interviews; documenting and promptly disclosing exculpatory and impeachment evidence; accurately documenting investigative work; and conducting constitutionally adequate investigations.

99.     By 1993, it was a well-established legal principle and a fundamental tenet of responsible police practices that fabricating evidence against a suspect

violates the suspect's constitutional rights. Nonetheless, the municipal defendants by and through their final policy makers, failed to either supervise their officers to ensure that they did not fabricate evidence, or discipline the officers when they did. These municipal failures created an environment of impunity in which fabricating evidence was tacitly and sometimes explicitly authorized.

100.    These systemic municipal lapses and unconstitutional fabrications of evidence were the norm throughout the 1990s and 2000s. For example, in 1994, RPD officers arrested, prosecuted, and covered up or withheld exculpatory and impeachment information—including evidence of their own misconduct—from an innocent man, Patrick Pursley. As a result, Patrick was wrongly convicted of a homicide he did not commit and spent 23 years in prison before he was proven innocent and released. The RPD officers manufactured a false inculpatory statement from Patrick's girlfriend at the time. The statement contained false details about the alleged murder weapon and the clothes Patrick was supposedly wearing when he allegedly committed the crime. The RPD officers failed to disclose that they improperly seized Patrick's clothes and the supposed murder weapon. Patrick was only exonerated after ballistics testing proved his innocence.

101.    Likewise, three men—TyJuan Anderson, Anthony Ross, and Lumont Johnson—were wrongfully convicted of homicide and sentence to 50 years in prison as a result of RPD officers fabricating statements, threatening witnesses, and withholding highly exculpatory evidence – including a third party confession of the

real killer. It was only after a former RPD officer came forward and admitted to a host of police misconduct that their convictions were reversed.

102.    Here, the Defendant Officers, in accordance with the municipal defendants' unconstitutional policy or practice of manufacturing false evidence and failing to train, supervise, and discipline officers, fabricated the evidence that led to Plaintiff's wrongful conviction and incarceration. Examples Include:

    a. the false confession;

    b. the false diagram of McDonald's developed by Detectives Scott and Redmond;

    c. the false statements of Lynn Hollingshed

103.    By 1993, police had a clearly established constitutional duty to disclose exculpatory and impeachment information to prosecutors under *Brady v. Maryland*, *Giglio v. United States*, and their progeny. Failing to carry out these *Brady* disclosure duties posed obvious risks for criminal defendants, yet the municipal defendants utterly failed to supervise or train police in this regard.

104.    The Rockford Police Department did not have a written policy on the requirements of *Brady v. Maryland* until 2010 nor did the municipal defendants or any of their agents provide its officers any supervision or training on these requirements before 2010.

105.    Further, the RPD did not conduct any audits or assessments to ensure that its officers understood *Brady* and its attendant requirements.

106.    In fact, it is clear that even today, at least some of the RPD officers do not understand *Brady,* its history, or requirements: Lt. Ahrens, who is responsible

for training Rockford police officers and has been with RPD since October 1993, believes and testified in 2017—54 years after *Brady v. Maryland* was issued—that "*Brady* came out heavily **just a couple of years ago**. And so, I don't know what was taught in City school or how they referred to it in that aspect."

107.    Further, other RPD officers were not able to articulate what *Brady* mandates and at least one officer described a *Brady* violation as "a document written by either the state's attorney or the chief of police."

108.    As a direct result of the municipal defendants' deliberate or reckless disregard to the obvious risk of harm to criminal defendants and innocent suspects like Plaintiff, *Brady* violations within the RPD persisted throughout the 1990s and 2000s and innocent people spent decades wrongfully incarcerated. For example, Patrick Pursley endured 23 years of imprisonment because RPD officers withheld exculpatory evidence including evidence that the gun they recovered from his home did not match the recovered bullets. They also hid their own misconduct— threatening and coercing his girlfriend into making a false inculpatory statement against him.

109.    Here the same municipal customs, practices, and systemic lapses in training, as well as systemic lapses in supervision and discipline, led police to cover up and withhold exculpatory and impeachment information from Plaintiff, including:

        a.    the fact that RPD officers coerced Lynn Hollingshed to implicate Plaintiff;

b.  the fact that Lynn Hollingshed was facing potential charges for a shooting that occurred approximately a month before the McDonald's shooting.

110.  These policies and practices were widespread and repeated themselves in numerous criminal investigations conducted by the Rockford Police Department.

111.  Nonetheless, and despite notice and sometimes involvement of the above-described unconstitutional policies and practices, the City of Rockford and officials within the Department failed to act to remedy the abused described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

112.  The policies and practices described in the foregoing paragraphs were consciously approved by City of Rockford policy makers who were deliberately indifferent or acted with reckless disregard to the violations of constitutional rights described herein.

113.  Those policies and practices were the proximate cause of the constitutional injuries that Plaintiff sustained, as described more fully above.

114.  Moreover, the City's failure to train its officers effectively condones, ratifies, and sanctions, the kind of misconduct that the Defendant Officers committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

## Plaintiff's Damages

115. John spent more than 23 years incarcerated for a crime he did not commit. He must now attempt to make a life for himself without the benefit of those life experiences that normally equip adults for that task.

116. As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, John sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than 23 years; physical pain and suffering; mental anguish; emotional distress; loss of family relationships; psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, embarrassment; loss of natural mental development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, and travel, for which he is entitled to monetary relief.

117. Additionally, the emotional pain and suffering caused by losing those years has been substantial. During his incarceration, John was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. John missed out on the ability to share holidays, births, funerals, and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being.

118. Because of the foregoing, John has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct.

## COUNT I—42 U.S.C. § 1983
### False Confession
### (Fifth and Fourteenth Amendments)

119. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

120. In the manner described more fully above, the Defendant Officers, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another and others, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

121. In addition, the Defendant Officers, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another and others, as well as under color of law and within the scope of their employment, used psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, as it was designed to injury Plaintiff, and it was not supported by any legitimate governmental interest.

122. Defendant Officers acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another and others, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

123. Specifically, Defendant Officers conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Plaintiff, using psychological coercion, which overbore Plaintiff's will and resulted in him making involuntary statements implicating himself in the robbery at the McDonald's and the deaths of Arthur Castaneda.

124. Those false incriminating statements were wholly fabricated by Defendant Officers and attributed to Plaintiff.

125. Those false incriminating states were used against Plaintiff to his detriment throughout his criminal case. They were one of the main reasons that Plaintiff was prosecuted and convicted of the McDonald's robbery and murder.

126. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

127. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical

and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

128. The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the RPD, in the manner more fully described below in Count VI.

**COUNT II—42 U.S.C. § 1983**
**Deprivation of Liberty without Probable Cause**
**(Fourth and Fourteenth Amendments)**

129. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

130. In the manner described more fully above, the Defendant Officers individually, jointly, and in conspiracy with one another, and others, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to cause the detention of Plaintiff without probable cause.

131. In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

132. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

133. As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation,

degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

134. The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the RPD, in the manner more fully described below in Count VI.

## COUNT III—42 U.S.C. § 1983
### Due Process
### (Fourteenth Amendment)

135. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

136. As described in detail above, the Defendant Officers while acting individually, jointly, and in conspiracy with one another, and others, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

137. In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

138. The Defendant Officers also fabricated and manufactured evidence and solicited false evidence, fabricated police reports falsely implicating Plaintiff in the shooting, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

139. In addition, these Defendants produced a series of false and fraudulent reports and related documents, which they inserted into their file and presented to state prosecutors and judges. These documents, which were used to show Plaintiff's purported connection to the shooting, contained statements and described events that were fabricated and that Defendants knew to be false. These Defendants signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was false.

140. Based upon information and belief, the Defendant Officers concealed and fabricated additional evidence that is not yet known to Plaintiff.

141. The misconduct of the Defendant Officers directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and there is a reasonable probability that he would not have been convicted.

142. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

143. As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

144. The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the RPD, in the manner more fully described below in Count VI.

## COUNT IV—42 U.S.C. § 1983
### Failure to Intervene

145. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

146. In the manner described above, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

147. As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

148. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

149. As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

150.     The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the RPD, in the manner more fully described below in Count VI.

### COUNT V—42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

151.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

152.     The Defendant Officers Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

153.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

154.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

155.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

156.     As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation,

degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

157. The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the RPD, in the manner more fully described below in Count VI.

## COUNT VI—42 U.S.C. § 1983
## Policy and Practice Claim against the City of Rockford

158. Plaintiff incorporates each paragraph of this Complaint as if fully restated herein.

159. As described more fully herein, the Defendant City of Rockford is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

160. Plaintiff's injuries were caused by the express policies, absence of needed express policies, and widespread practices and customs of the City, as well as by the actions of policymaking officials for the City.

161. At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City failed to promulgate proper or adequate rules, regulations, policies, or procedures on: the conduct of interrogations and questioning of criminal suspects by officers and agents of the RPD and the City; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; the obtaining statements and testimony from witnesses; the interviews or interrogations of juvenile suspects; access to juvenile suspects by their parents and/or guardians; the maintenance of investigative files and disclosure of those files

in criminal proceedings; and meaningfully disciplining officers accused of such unlawful conduct. In addition or in the alternative, the City failed to train or supervise officers and agents of the RPD and the City, on the above topics, as well as the conduct of interrogations and the techniques to be used when questioning criminal suspects, including juvenile suspects and witnesses, and access to juvenile suspects by their parents and/or guardians. The City declined to implement any or adequate policies or training in these areas even though the need for such policies and training was obvious, and the failure to do so would lead to violations of constitutional rights. The decision not to implement any or adequate policies or training in these areas also contributed to the widespread practices described in this Complaint.

162. The failure to promulgate proper or adequate rules, regulations, policies, procedures, and training was committed by officers and agents of the RPD and the City, including the Defendants.

163. At all times relevant herein, final policymakers for the City and the RPD knew of these problems and allowed them to continue, and made decisions not to implement adequate policies, training, supervision, or discipline.

164. The constitutional violations complained of by Plaintiff were a highly predictable consequence of a failure to equip Rockford police officers with the specific tools—including policies, training, and supervision—to handle the recurring situations of how to handle, preserve, and disclose exculpatory evidence; and how to conduct juvenile suspect interrogations.

165. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City had notice of a widespread practice and custom by officers and agents of the RPD and the City under which individuals suspected of criminal activity, such as Plaintiff, were routinely coerced against their will to involuntarily implicate themselves in crimes that they had not committed. It was common that suspects interrogated in connection with investigations within the jurisdiction of the RPD and the City falsely confessed, under extreme duress and after suffering physical and/or psychological abuse, to committing crimes to which they had no connection.

166. Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess

involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

167.     Furthermore, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City had interrelated *de facto* policies, practices, and customs which included: (1) conducting physically, psychologically, or otherwise illegal or improperly coercive interrogations of witnesses, suspects, and arrestees, in order to obtain confessions, including from juveniles and teenagers; (2) manufacturing, fabricating, and/or using improper suggestive tactics to obtain statements from suspects and witnesses, particularly juveniles or teenagers; (3) filing false police reports, and giving false statements and testimony about these interrogations, confessions, and witness statements; (4) suppressing evidence concerning the circumstances of these interrogations and confessions; (5) pursuing and obtaining prosecutions and incarceration on the basis of confessions obtained during these interrogations, and otherwise covering up the true nature of the interrogations, confessions, and witness statements; (6) failing to video and/or audio record the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in parts (1) and (2), above; (7) failing to properly train supervise, discipline, transfer, monitor, counsel, and/or otherwise control police officers, particularly those who were repeatedly accused of physically, psychologically, or otherwise illegally or improperly engaging in coercive

questioning or interrogation of witnesses, suspects and arrestees; of torture and related physical abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions; and/or making false reports and statements; and (8) the police code of silence, specifically in cases where officers engaged in the violations articulated above, whereby police officers refused to report or otherwise covered up instances of police misconduct, and/or fabricated, suppressed, and/or destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. This code of silence also has resulted in police officers either remaining silent or giving false and misleading information, and/or testimony during official investigations and grand jury proceedings, in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and/or their fellow officers have been accused of misconduct.

168.    The interrelated pattern and practices alleged above were or should have been well-known within the RPD, both before and after Plaintiff was interrogated and wrongfully convicted, as well as by successive mayors, police superintendents, and other policymaking, command, and supervisory City and police personnel, who participated in the cover-up and/or continuation of the policies and practices for years.

169.    The interrelated policies, practices, customs, and failure to train set forth above, both individually and together, were maintained and implemented with deliberate indifference. They encouraged, *inter alia*, the coercing of statements from

suspects, witnesses, and arrestees, particularly from juveniles and other teenagers; the construction and fabrication of confessions, admissions, statements, and other false witness evidence; the suppression and destruction of exculpatory evidence; the intimidation of witnesses; the making of false statements and reports; the giving of false testimony; the conducting of suggestive lineups and arrays; the fabrication of evidence; the obstruction of justice; and the pursuit and continuation of wrongful convictions and false arrests and imprisonments. The interrelated policies, practices, customs, and failure to train set forth above were, separately and together, a moving force behind the unconstitutional acts and perjury committed by the Defendants and their co-conspirators, and the injuries suffered by Plaintiff, including his wrongful conviction and imprisonment.

170.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City had notice of widespread practices by officers and agents of the RPD, and the City, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated police reports and other false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) pursued wrongful convictions through profoundly flawed investigations.

171.     These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City directly encouraged and were the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

172.     The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

173.     As a result of the policies and practices of the City and the RPD, numerous individuals have been wrongly convicted of crimes that they did not commit.

174.     In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City or were actually committed by persons with such final policymaking authority.

175.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City, including but not limited to the individually

named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VII—State Law Claim
### Intentional Infliction of Emotional Distress

176. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

177. The actions, omissions, and conduct of the Defendant Officers, acting as investigators and as set forth above, were extreme and outrageous.

178. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

179. As a result of these Defendants' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT IX—State Law Claim
### Civil Conspiracy

180. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

181. As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish and unlawful purpose by an

unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

182.   The violations of Illinois law described in this Complaint, including their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

183.   The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

184.   As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X—State Law Claim
### Indemnification

185.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

186.   Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

187.   The Police Officer Defendants are or were employees of the RPD, an agency of the City of Rockford, who acted within the scope of their employment in committing the misconduct described above.

188.    The City is liable to indemnify any compensatory judgment awarded against the Defendant Officers.

## COUNT XI—State Law Claim
### *Respondeat Superior*

189.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

190.    In committing the acts alleged in the preceding paragraphs, the Defendant Police Officer Defendants are or were employees of the City of Rockford, acting at all relevant times within the scope of their employment and under color of law.

191.    Defendant City of Rockford is liable as a principal for all torts committed by its agents.

* * *

Wherefore, Plaintiff, John Horton, respectfully request that this Court enter judgment in his favor and against Defendants, City of Rockford, Arduino, Barton, Forrester, Gambini, Gray, Hanson, Iasparro, Johnson, Kellett, Lindmark, McDonald, Nelson, Olsen, Piccirilli, Pirages, Pobjecky, Pozzi, Redmond, Schmidt, B. Scott, D. Scott, Triolo, and Unknown Employees of the City of Rockford, awarding compensatory damages, costs, and attorneys' fees, as well as punitive damages against all individual defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, John Horton, hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:

/s/ Cindy Tsai

Attorneys for John Horton

Arthur Loevy
Jon Loevy
Elliot Slosar
Cindy Tsai
LOEVY & LOEVY
311 North Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900